AO 93B  (Rev. 11/13) Anticipatory Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Location in which beeper in UPS parcel with tracking number 1Z T00 96Y 67 2883 0038 indicates the device has been activated or visual surveillance indicates the parcel has been opened. | )<br>)<br>)<br>)<br>)<br>)   Case No.    8:21-MJ-00722 |

## ANTICIPATORY SEARCH AND SEIZURE WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the    Central    District of    California
*(identify the person or describe the property to be searched and give its location)*:

    *See Attachment A*

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property UPON OCCURRENCE OF THE FOLLOWING CONDITION(S) *(state the condition(s) which must occur to establish probable cause)*:

    *See Attached Affidavit.*

    I further find that upon the occurrence of the conditions specified above, such search will reveal *(identify the person or describe the property to be seized)*:

    *See Attachment B*

    Such affidavit(s) or testimony are incorporated herein by reference and attached hereto.

**YOU ARE COMMANDED** to execute this warrant on or before   14 days from the date of its issuance   *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

    Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to   the U.S. Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office   .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b),  I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

   ☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   October 26, 2021, at 4:25 pm _____

**DOUGLAS F. McCORMICK**
*Judge's signature*

City and state:   Santa Ana, CA _____

Hon. Douglas F. McCormick, U.S.
*Printed name and title*

AUSA: Charles Pell (ext. 3542)

AO 93B  (Rev. 11/13) Anticipatory Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| Certification |
|---|

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## AFFIDAVIT

I, Binh Dang, being duly sworn, declare and state as follows:

### I.   PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of an application for the following:

a.   A warrant authorizing the installation and use of a Global Positioning Service ("GPS") tracking device (the "TRACKING DEVICE") and an electronic signaling device (the "beeper"), for a period of up to 14 days, in a UPS parcel originating from Micahel [sic] LEE, 10281 Grace Rd., Surrey, British Columbia, Canada, with tracking number 1Z T00 96Y 67 2883 0038, addressed to Trung LEE, 15943 Mount Jackson Street, Fountain Valley, California 92708 (the "SUBJECT PARCEL"); and

b.   An anticipatory search warrant to authorize a search of the premises in which the SUBJECT PARCEL is opened (the "SUBJECT PREMISES") as determined by visual observation by a law enforcement official and/or an alert sent to law enforcement officials by the beeper signaling that the SUBJECT PARCEL has been opened, after the occurrence of the circumstances detailed in Section IV below.  The SUBJECT PARCEL contains approximately 3,590 grams of methylenedioxymethamphetamine ("MDMA") in pill form.

2.   The requested anticipatory search warrant seeks authorization to seize evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (Manufacturing, Distribution of, and Possession with Intent to Distribute, a

1

Controlled Substance), 843(b) (Unlawful Use of a Communication Facility (including the mails) to Facilitate the Distribution of a Controlled Substance), 846 (Attempt and Conspiracy to Commit Controlled Substance Offense), 952 (Importation of a Controlled Substance), and 963 (Attempt and Conspiracy to Import a Controlled Substance) (collectively, the "SUBJECT OFFENSES"), as described more fully in Attachment B.  Attachments A and B are incorporated by reference herein.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## I.    BACKGROUND OF AFFIANT

4.    I have been employed since March 2004 as a Special Agent ("SA") with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), presently assigned to the Office of the Assistant Special Agent in Charge, Orange County, California.  I am currently assigned to the HSI Orange County Narcotics Group (OC-3), investigating narcotics offenses, including the international smuggling of narcotics.  During the investigation of these cases, I have participated in the

execution of search and arrest warrants, and seized evidence in violations of law.  I have completed the DHS, Federal Law Enforcement Training Center, Criminal Investigator Training Program as well as the ICE Special Agent Training Program. Prior to my assignment at HSI Orange County, I was assigned to HSI Los Angeles in the Seaport Investigations Group, Computer Forensics and Intellectual Property Rights Group.

5.    In 2004, I attended and completed the Criminal Investigator Training Program and HSI Special Agent Training at the Federal Law Enforcement Center in Glynco, Georgia.  Through my training, I have learned of HSI's criminal investigative and arrest authority, as well as investigative techniques for performing criminal investigations, including drug trafficking investigations.

6.    As an SA with the HSI, my primary responsibilities are investigating violations of federal law involving importation and exportation crimes, gang-related crimes, and the distribution of and possession with intent to distribute drugs, in violation of Title 21 of the United States Code.  I have executed and participated in numerous search warrants to seize evidence of violations of federal and state law, as well as arrest warrants to apprehend individuals who have committed such violations.

### III.  TRACKING DEVICE INSTALLATION AND MONITORING

7.    The TRACKING DEVICE and beeper will be installed in the SUBJECT PARCEL and will send signals that allow law enforcement officers to monitor the location of the SUBJECT

PARCEL and to determine whether or not the SUBJECT PARCEL has been opened by transmitting an alert to law enforcement agents when the SUBJECT PARCEL has been opened.

## IV.   <u>TRIGGERING CIRCUMSTANCES</u>

8.   The anticipatory search warrant to search the SUBJECT PREMISES will be triggered by the following circumstances:

a.   Upon obtaining a warrant to include the TRACKING DEVICE and the beeper in the SUBJECT PARCEL, law enforcement officers will conduct a controlled delivery of the SUBJECT PARCEL, by means of an undercover law enforcement official hand-delivering it to the recipient address listed on the SUBJECT PARCEL.  If there is no answer at the address, the law enforcement official will leave the SUBJECT PARCEL near the front door.

b.   Law enforcement agents will monitor the SUBJECT PARCEL with visual surveillance and electronic monitoring.  When law enforcement agents visually observe that the SUBJECT PARCEL has been brought into the SUBJECT PREMISES and the beeper transmits a signal that the SUBJECT PARCEL has been opened, law enforcement agents will be authorized to execute the warrant and enter the SUBJECT PREMISES to search for and seize the fruits, instrumentalities, and evidence of the SUBJECT OFFENSES.

c.   If the SUBJECT PARCEL has not been opened within 60 minutes after the SUBJECT PARCEL has been delivered to the SUBJECT PREMISES, law enforcement officers will be authorized to enter any premises in which the SUBJECT PARCEL is located for

the sole purpose of retrieving the SUBJECT PARCEL, the TRACKING DEVICE, and the beeper.

## V.   BACKGROUND ON DARK WEB AND VENDORS

9.   Based on my training, research, education, and experience, and the collective experiences related to me by other law enforcement officers who specialize in investigations relating to the Dark Web and its vendors:

a.   The "dark web," also sometimes called the "dark net" or "deep web," is a colloquial name for a number of extensive, sophisticated, and widely used criminal marketplaces operating on the Internet, which allow participants to buy and sell illegal items, such as drugs, firearms, and other hazardous materials with greater anonymity than is possible on the traditional Internet (sometimes called the "clear web" or simply "web"). These online black market websites use a variety of technologies, including the Tor network (defined below) and other encryption technologies, to ensure that communications and transactions are shielded from interception and monitoring. A famous dark web marketplace, Silk Road, operated similarly to legitimate commercial websites such as Amazon and eBay, but offered illicit goods and services. Law enforcement shut down Silk Road in 2013.

b.   The "Tor network," or simply "Tor," is a special network of computers on the Internet, distributed around the world, that is designed to conceal the true Internet Protocol ("IP") addresses of the computers accessing the network, and, thereby, the locations and identities of the network's users.

Tor likewise enables websites to operate on the network in a way that conceals the true IP addresses of the computer servers hosting the websites, which are referred to as "hidden services" on the Tor network.

  c. "Vendors" are the dark web's sellers of goods and services, often of an illicit nature, and they do so through the creation and operation of "vendor accounts."  Customers, meanwhile, operate "customer accounts."  It is possible for the same person to operate one or more customer accounts and one or more vendor accounts at the same time.

  d. When vendors receive orders for narcotics on the dark web, the orders can come from anywhere in the world; vendors are known to use U.S. mail and/or commercial carriers to distribute narcotics.

  e. Digital currency (also known as crypto-currency or virtual currency)[1] is generally defined as an electronic-sourced unit of value that can be used as a substitute for fiat currency (i.e., currency created and regulated by a government). Digital currency exists entirely on the Internet and is not stored in any physical form.  Digital currency is not issued by any government, bank, or company and is instead generated and controlled through computer software operating on a decentralized peer-to-peer network.  Digital currency is not illegal in the United States and may be used for legitimate

---

[1] For purposes of this affidavit, "digital currency," "crypto-currency," and "virtual currency" address the same concept.

financial transactions.  However, digital currency is often used for conducting illegal transactions, such as the sale of controlled substances.

        f.    "Bitcoin" (or "BTC") is a type of online digital currency that allows users to transfer funds more anonymously than would be possible through traditional banking and credit systems.  Bitcoins are a decentralized, peer-to-peer form of electronic currency having no association with banks or governments.  Users store their bitcoins in digital "wallets," which are identified by unique electronic "addresses."  A digital wallet essentially stores the access code that allows an individual to conduct Bitcoin transactions on the public ledger. To access Bitcoins on the public ledger, an individual must use a public address (or "public key") and a private address (or "private key").  The public address can be analogized to an account number while the private key is like the password to access that account.  Even though the public addresses of those engaging in Bitcoin transactions are recorded on the public ledger, the "Blockchain," the true identities of the individuals or entities behind the public addresses are not recorded.  If, however, a real individual or entity is linked to a public address, it would be possible to determine what transactions were conducted by that individual or entity.  Bitcoin transactions are, therefore, described as "pseudonymous," meaning they are partially anonymous.

        g.    Although they are legal and have known legitimate uses, bitcoins are also known to be used by cybercriminals for

money-laundering purposes, and are believed to be the most oft-
used means of payment for illegal goods and services on "dark
web" websites operating on the Tor network.  By maintaining
multiple bitcoin wallets, those who use bitcoins for illicit
purposes can attempt to thwart law enforcement's efforts to
track purchases within the dark web marketplace.

  h. Bitcoin is one example of a digital currency;
other digital currencies, such as Ethereum and Litecoin, also
exist and are used by darknet actors.  The technology underlying
these currencies are similar, though these currencies provide
more privacy and anonymity of the users.

  i. Exchangers and users of cryptocurrencies store
and transact their cryptocurrency in a number of ways, as wallet
software can be housed in a variety of forms, including on a
tangible, external device ("hardware wallet"), downloaded on a
PC or laptop ("desktop wallet"), with an Internet-based cloud
storage provider ("online wallet"), as a mobile application on a
smartphone or tablet ("mobile wallet"), printed public and
private keys ("paper wallet"), and as an online account
associated with a cryptocurrency exchange.  Because these
desktop, mobile, and online wallets are electronic in nature,
they are located on mobile devices (e.g., smart phones or
tablets) or at websites that users can access via a computer,
smart phone, or any device that can search the Internet.

  j. Moreover, hardware wallets are located on some
type of external or removable media device, such as a USB thumb
drive or other commercially available device designed to store

cryptocurrency (e.g., Trezor, Keepkey, or Nano Ledger).  In addition, paper wallets contain an address and a QR code[2] with the public and private key embedded in the code.  Paper wallet keys are not stored digitally.  Wallets can also be backed up into, for example, paper printouts, USB drives, or CDs, and accessed through a "recovery seed" (random words strung together in a phrase) or a complex password.  Additional security safeguards for cryptocurrency wallets can include two-factor authorization (such as a password and a phrase).  I also know that individuals possessing cryptocurrencies often have safeguards in place to ensure that their cryptocurrencies become further secured in the event that their assets become potentially vulnerable to seizure and/or unauthorized transfer.

k.   Some companies offer cryptocurrency wallet services which allow users to download a digital wallet application onto their smart phone or other digital device.  A user typically accesses the wallet application by inputting a user-generated PIN code or password.  Users can store, receive, and transfer cryptocurrencies via the application; however, many of these companies do not store or otherwise have access to their users' funds or the private keys that are necessary to access users' wallet applications.  Rather, the private keys are stored on the device on which the wallet application is installed (or any digital or physical backup private key that the user creates).

---

[2] A QR code is a matrix barcode that is a machine-readable optical label.

l.   As a result, these companies generally cannot assist in seizing or otherwise restraining their users' cryptocurrency.  Nevertheless, law enforcement could seize cryptocurrency from the user's wallet directly, such as by accessing the user's smart phone, accessing the wallet application, and transferring the cryptocurrency therein to a law enforcement-controlled wallet.  Alternatively, where law enforcement has obtained the recovery seed for a wallet (see above), law enforcement may be able to use the recovery seed phrase to recover or reconstitute the wallet on a different digital device and subsequently transfer cryptocurrencies held within the new wallet to a law enforcement-controlled wallet.

m.   Darknet marketplaces often only accept payment through digital currencies, such as Bitcoin, and operate an escrow whereby customers provide the digital currency to the marketplace, who in turn provides it to the vendor after a transaction is completed.  Accordingly, large amounts of Bitcoin sales or purchases by an individual can be an indicator that the individual is involved in drug trafficking or the distribution of other illegal items.  Individuals intending to purchase illegal items on Silk Road-like websites need to purchase or barter for Bitcoins.  Further, individuals who have received Bitcoins as proceeds of illegal sales on Silk Road-like websites need to sell their Bitcoins to convert them to fiat (government-backed) currency.

## VI.  STATEMENT OF PROBABLE CAUSE

10.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.  Discovery of MDMA in the SUBJECT PARCEL**

11.  On or about October 21, 2021, the SUBJECT PARCEL, which was destined to the United States, was seized by Canada Border Service Agency ("CBSA") during a customs inspection at the Vancouver International Airport Air Cargo Branch.  Border Services Officer (BSO) E. Bautista conducted an initial examination of the SUBJECT PARCEL, which revealed a brand new filtering machine with all the components, but within the "bucket" of the filter were 2 semi-clear bags containing multiple tablets.

12.  The shipment was closed up and brought back to the Air Cargo warehouse for further examination. This was done under BSF 241# B416144.  BSO Bautista and BSO M. Bathan used an ion swab on the outside of one of the bags and was tested using the ion scanner. The test came back positive for MDMA. The 2 bags were then weighed and totaled 3,590 grams. With the authorization of Superintendent Louie, BSO Bautista seized the 3,590 grams of MDMA for inaccurate information of narcotics under CS-FRM 8211-21-1389.

13.  The total value of the seizure was $125,650.00 CAD. Based on my training and experience, I know that 3,590 grams of MDMA pills is a significant quantity of pills that is likely to be redistributed in smaller quantities.

14.   The SUBJECT PARCEL carried the United Parcel Service ("UPS") tracking number 1Z T00 96Y 67 2883 0038 and was addressed to Trung LEE, at 15943 Mount Jackson Street, Fountain Valley, California, 92708 ("15943 Mount Jackson St.") with a telephone number 1-714-766-4195.  According to the postage stamp, the SUBJECT PARCEL was mailed on October 19, 2021.  The sender was listed as Micahel [sic] LEE, 10281 Grace Road, Surrey, British Columbia, V3V3V7, Canada.

15.   On October 22, 2021, CBSA performed a Fourier Transform Infrared ("FTIR") test on a pill from one of the bags in the SUBJECT PARCEL.  The test result confirmed that the pill is consistent with MDMA.

16.   Also, on October 22, 2021, an ion mobility spectrometry ("IMS") Plasmagram test was administered on a pill from one of the bags in the SUBJECT PARCEL.  The test result confirmed that the pill is consistent with MDMA.

17.   Also, on October 22, 2021, an immunoassay test was administered on a pill from one of the bags in the SUBJECT PARCEL.  The test result confirmed that the pill was positive for amphetamines and/or analogues.

**B.   Investigation into the SUBJECT PREMISES**

18.   On or about October 21, 2021, CBSA seized the SUBJECT PARCEL and notified the Department of Homeland Security.  CBSA then agreed to send the SUBJECT PARCEL to HSI in Orange County for a possible controlled delivery to the listed address of 15943 Mount Jackson Street, Fountain Valley, California, 92708. On October 25, 2021, the SUBJECT PARCEL was transferred from the

RCMP custody to HSI Blaine, Washington.  On the same date, HSI Blaine shipped the SUBJECT PARCEL via FedEx to HSI Orange County.  The package is scheduled to be delivered to HSI Orange County on October 26, 2021.

19.  I, along with other agents, began investigating "Trung LEE" and the address 15943 Mount Jackson Street.  Checks of law enforcement and public databases did not indicate any person by the name of "Trung LEE" at the 15943 Mount Jackson Street address.

### VII.  TRAINING AND EXPERIENCE ON NARCOTIC OFFENSES

20.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers on my team who specialize in investigations relating to the sale and distribution of illegal narcotics and the proceeds from the sale of illegal narcotics, I am aware that the LA/Orange County Metropolitan Areas are a major source area for controlled substances.  As such, illegal narcotics are frequently transported from and to LA/Orange Counties in parcels, including through the United States Mail, and the proceeds from the sale of the controlled substances are frequently returned to the LA/Orange County areas in parcels via the United States Mail.  These proceeds are generally in larger amounts of money, over $100.

21.  Based on my training and experience in investigating, arresting, and prosecuting narcotics traffickers that operate through parcels, I am aware of the following:

a.   That the distribution of narcotics is a continuing criminal activity that occurs over months, and often years, and that persons who are involved in drug trafficking conceal, in various locations, including their residence, cash, caches of drugs, drug paraphernalia, amounts of jewelry, automobiles, automobile titles, deeds to property, and other items of value and/or proceeds of drug transactions, as well as evidence of financial transactions relating to obtaining, transferring, secreting or spending large sums of money acquired from engaging in narcotics trafficking activities;

b.   That narcotics traffickers maintain books, records, receipts, notes, ledgers, bank records, money orders, and other papers relating to the cultivation/manufacture, transportation, ordering, sale and distribution of illegal controlled substances.  These individuals commonly "front" (provide illegal controlled substances on consignment) illegal controlled substances to their clients and thus keep some types of records or communication concerning monies owed.  The aforementioned books, records, communications, receipts, notes, ledgers, etc., are maintained where the narcotics trafficker has ready access to them, that is, in places that include the narcotics traffickers' respective residence(s) and place(s) of business, as well as locations from which the narcotics trafficker conducts drug transactions.  These records are kept whether or not the narcotics trafficker is in possession of drugs at any given moment, and may be stored in paper or digital format;

c.   That narcotics traffickers maintain on hand, large amounts of United States currency, usually exceeding $100, in order to maintain and finance their ongoing narcotics trafficking businesses, which operate on a cash basis;

d.   That when narcotics traffickers amass large quantities of cash from the sale of narcotics, the narcotics trafficker often attempts to legitimize these profits through the use of foreign and domestic banks and financial institutions and their attendant services that include false and fictitious business records and accounts, securities, travelers checks, cashier's checks, money orders, wire transfers, stock certificates, bonds, certificates of deposit, letters of credit, brokerage houses, real estate shell corporations, business fronts and safety deposit boxes;

e.   That narcotics traffickers often place assets in names of relatives, close friends, or fictitious names in order to avoid detection of those assets by law enforcement agencies; and that even though these assets are in another individual's name, the narcotics dealers retain records, documents, and deeds reflecting the purchase of those assets while continuing to use those assets and exercise dominion and control over them;

f.   That narcotics traffickers use telephones, portable cellular and digital telephones, pagers and other communication devices sometimes in fictitious and/or other individuals' names and maintain telephone and address books, telephone bills and other books and papers that reflect names,

addresses, and/or telephone numbers of their associates in the narcotic trafficking organization and customers of narcotics;

g.    That narcotics traffickers commonly receive telephone calls and messages on telephone answering machines from individuals seeking to conduct narcotics transactions;

h.    That narcotics traffickers commonly have in their possession, that is, on their persons, at their residences and/or at their stash locations, firearms, including handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons, that are used to facilitate the narcotics trafficking operation by securing the narcotics trafficker's property, including narcotics, narcotic paraphernalia, currency, jewelry, and records;

i.    That narcotics traffickers involved in packaging narcotics for distribution through parcels often have large quantities of packing materials on hand, including, but not limited to, cardboard boxes, packing peanuts, plastic wrap, plastic containers, and towels.

## VIII. TRAINING AND EXPERIENCE REGARDING EVIDENCE ASSOCIATED WITH DARKNET ACTIVITY AND DIGITAL CURRENCY

22.   Individuals involved in digital currency, including those who launder funds by using digital currency, use a variety of digital devices, such as phones and computers.  These individuals also use multiple digital devices in order to maintain anonymity and to compartmentalize communication, or use encrypted forms of communication in speaking with criminal associates.  Additionally, those who use digital currency may

store their "recovery seed" or "private keys" on digital devices.  This also includes personal digital devices that the individual carries on their person.  Additionally, accessing the darkweb can occur by USB or flash-drive device.  Based on my training and experience, individuals who have such valuable information store this information separate and away from their routine drug operations such that it is safe from theft and/or law enforcement and compartmentalized.

23.  Based on my training and experience, I know that those who receive cryptocurrency for illicit activity seek to store/change the value in forms other than cryptocurrency.  For example, those who receive proceeds from illicit in cryptocurrency will seek to exchange that for fiat cash (using non-regulated financial institutions) and/or exchange for other items of value, such as gift cards and precious metals.  There has been an increasing number of vendors who exchange cryptocurrency for gift cards and precious metals and who do not necessarily report such transactions to the federal government to the extent those reports are required.

### IX.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[3]

24.  Through my training and experience, I am aware that narcotics purchased from foreign countries, and shipped to the

---

[3] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related

United States are often purchased using the Internet via a digital device, such as a computer or mobile telephone. These purchases often take place via email, text message, or other electronic means.

25. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That

communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

26.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus,

often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

     b.   Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

     27.  The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

     a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition

function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    For these reasons, if while executing the warrant, law enforcement personnel encounter a digital device that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) compel the use of Jeremy LEE's thumb- and/or fingerprints on the device(s); and (2) hold the device(s) in front of the face of Jeremy LEE with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

28.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

## X.   <u>CONCLUSION</u>

29.   For all of the reasons described above, there is probable cause to believe that evidence of violations of the SUBJECT OFFENSES, as described above and in Attachment B of this affidavit, will be found in a search of the SUBJECT PREMISES, as further described above and Attachment A, and also that a warrant authorizing the installation and use of a GPS tracking device on the SUBJECT PARCEL should issue.


Attested to by the applicant in accordance with the requirements of <u>Fed. R. Crim. P. 4.1</u> by telephone on this <u>26th</u> day of October 2021.


**DOUGLAS F. McCORMICK**
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

**PREMISES TO BE SEARCHED**

The premises to be searched (the "SUBJECT PREMISES") is the location into which the SUBJECT PARCEL (a UPS parcel with tracking number 1Z T00 96Y 67 2883 0038) has been brought when the beeper device within the SUBJECT PARCEL is triggered, signifying that the SUBJECT PARCEL has been opened, or where visual surveillance demonstrates that the SUBJECT PARCEL has been opened (hereinafter referred to as the "triggering event"). The SUBJECT PREMISES is strictly limited to the location in which the triggering event occurs, including a vehicle.  This search is to include all rooms, attics, and other parts therein, all safes, locked cabinets, containers, and boxes, the surrounding grounds and any garages, storage rooms, trash containers, and outbuildings of any kind located thereon.

If the SUBJECT PARCEL has not been opened within 60 minutes after the SUBJECT PARCEL has been delivered to the SUBJECT PREMISES, law enforcement officers will be authorized to enter any premises in which the SUBJECT PARCEL is located for the sole purpose of retrieving the SUBJECT PARCEL, the TRACKING DEVICE, and the beeper.

**ATTACHMENT B**

**I.   ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations 21 U.S.C. §§ 841(a)(1) (Manufacturing, Distribution of, and Possession with Intent to Distribute, a Controlled Substance), 843(b) (Unlawful Use of a Communication Facility (including the mails) to facilitate the Distribution of a Controlled Substance), 846 (Attempt and Conspiracy to Commit Controlled Substance Offense), 952 (Importation of a Controlled Substance), and 963 (Attempt and Conspiracy to Import a Controlled Substance) (collectively, the "SUBJECT OFFENSES"), namely:

a.   The SUBJECT PARCEL (UPS parcel with tracking number 1Z T00 96Y 67 2883 0038) and its contents;

b.   Any electronic tracking device or any portion thereof inside the SUBJECT PARCEL;

c.   Any controlled substances, controlled substance analogues, or listed chemicals;

d.   Records reflecting the use of a dark web moniker or handle, or other online monikers or pseudonyms, reflecting the use of vendor or buyer accounts on dark web marketplaces.

e.   Records concerning the establishment or management of an online or dark web controlled substance retail business, including documents and other records relating to the creation or hosting of websites, evidence of dark web or Tor Browser access, merchant accounts for customer transactions, product vendors or sources of supply, invoices, order forms, and

i

communications with co-conspirators and others about any of the aforementioned subjects.

f.    Records concerning financial transactions associated with the operations or proceeds of an online or dark web controlled substance retail business, including any paper or digital account opening documents, statements, deposit slips, checkbooks, orders or confirmations of wire transfers.

g.    Records of any accounts or transactions within the traditional banking or credit systems or via cryptocurrencies such as bitcoin.

h.    Digital currency, such as bitcoin, cryptocurrency (or digital currency) private keys, and digital currency recovery seeds, as further explained in paragraph 4 below.

i.    Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing and canning devices, balloons, packaging materials, aromatic substances such as laundry soap, dryer sheets, air fresheners, or axle grease, containers, and money counters;

j.    Diluents and other agents used to dilute, or "cut," drugs in order to increase the drugs' volume or weight, including mannitol, mannite, lactose, Vitamin B12, and MSM;

k.    Items used in the packaging of currency for consolidation and transportation, including money-counting machines, money wrappers, carbon paper, rubber bands, duct tape

or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

l.    Documents, records, and other items relating to the use of USPS or commercial express mail delivery companies, such as FedEx, UPS, and DHL, to ship drugs or money to various points within the United States, including air bills, empty or previously used mailing boxes, packing tape, packaging materials, package tracking records, and transaction receipts;

m.    Documents and records relating to travel by air, bus, car, or other means, including calendars, travel itineraries, maps, airline ticket, baggage check stubs, frequent use club membership information, airline, hotel and rental car receipts, credit card bills and receipts, photographs, videos, passports, and visas;

n.    Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply for controlled substances, or drug customers, sources of funds, financial records, records that may indicate ownership of cash and funds, including calendars, address books, telephone or other contact lists, hard copy correspondence, notes, photographs, and videos;

o.    Records, documents, programs, applications or materials relating to the trafficking of controlled substances, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting

price, quantities, and times when controlled substances were bought, sold, or otherwise distributed;

    p.   Documents and keys relating to storage units, rental cars, safety deposit boxes, or Commercial Mail Receiving Agencies;

    q.   Any shipping materials including, but not limited to: envelopes, boxes, and containers;

    r.   Records showing ownership, dominion, or control over the premises searched, including utility statements and records, journals, records of occupancy, rental or lease agreements, letters, notes, and correspondence, not to exceed 15 items;

    s.   Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of drugs, or drug customers, including calendars, address books, telephone or other contact lists, hard copy correspondence, and notes;

    t.   United States currency in excess of $2,000, including the first $2,000 if more than $2,000 is seized, digital currency such as Bitcoin stored on electronic wallets or other forms of wallets or other means, cryptocurrency private keys and recovery seed, and records relating to income derived from the transportation, sales, and distribution of controlled substances and expenditures of money and wealth, for example, money orders, wire transfers, cashier's checks and receipts, passbooks, cash cards, gift cards, checkbooks, check registers,

securities, precious metals, jewelry, antique or modem automobiles, bank statements and other financial instruments, including stocks or bonds in amounts indicative of the proceeds of illicit narcotic trafficking.

u.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

v.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

v

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output

devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

4.   Seizure of any cryptocurrency/digital currency private keys and recovery seeds shall also be construed to include seizure of any cryptocurrency related to any such seized private keys and/or recovery seeds, and such seizure shall allow transfer of any such related cryptocurrency to one or more government controlled accounts, or "wallets."

II.   <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

5.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic

image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

      b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

        i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

        ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques

      c.    If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime

was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling

outside the scope of the items to be seized absent further order of the Court.

6.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.    During the execution of this search warrant, law enforcement personnel are authorized to: (1) depress the thumb-

x

and/or fingers of Jeremy LEE onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of any of those persons with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.